(Eddie) Jae K. Kim (CA Bar No. 236805)
**LYNCH CARPENTER, LLP**
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Tel.:   (626) 550-1250
ekim@lcllp.com

**LYNCH CARPENTER, LLP**
Gary F. Lynch (To apply *pro hac vice*)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel.:   (412) 322-9243
gary@lcllp.com

*Counsel for Plaintiff and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MEEKS, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>DELTA DENTAL OF CALIFORNIA,<br><br>    Defendant, | Case No. 3:24-cv-202<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff John Meeks ("Plaintiff"), by and through his undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant Delta Dental of California ("Defendant" or "Delta Dental"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and his own personal knowledge.

## NATURE OF THE ACTION

1.      Healthcare plans and health insurance companies who handle sensitive, personally identifiable information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2.      The harm resulting from a health data and privacy breach manifests in a number of ways, such as identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach

ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional precautionary measures.

3.    Delta Dental is a California-based dental insurance company. The Delta Dental network and its affiliates provide dental insurance to more than 45 million members across 15 states.

4.    As part of its business operations, Delta Dental uses a managed file transfer software called MOVEit. MOVEit software is likewise used by a number of commercial entities and federal and state agencies to transfer large data files.

5.    As a provider of dental insurance services, Delta Dental knowingly obtains sensitive patient PII and PHI from its members and, thus, has a resulting duty to securely maintain such information against unauthorized access and disclosure through reasonable and adequate data security measures.

6.    Delta Dental expressly recognizes this duty, telling its members that Delta Dental is "required by law to maintain the privacy and security of your Protected Health Information (PHI),"[1] and promising to "maintain physical, electronic and procedural security measures to safeguard individually identifiable nonpublic personal information in [its] possession."[2]

7.    Despite Delta Dental's duty to safeguard the PII and PHI of its members, Plaintiff's and Class Members' sensitive information was access and exfiltrated by unauthorized third parties during a massive data breach that occurred between May 27, 2023, and May 30, 2023 (the "Data Breach" or "Breach"). The Data Breach exploited a vulnerability in the MOVEit technology, which Defendant uses in its regular course of business.

8.    Since the Data Breach, a multitude of commercial and governmental entities have announced their data, and therefore the data of millions of their customers, clients, and/or members, has

---

[1] *HIPAA Notice of Privacy Practices*, Delta Dental of California, https://www1.deltadentalins.com/about/legal/privacy/hipaa-privacy.html (last visited Jan. 9, 2024).

[2] *Gramm-Leach-Bliley (GLB) Financial Privacy Notice*, Delta Dental of California, https://www1.deltadentalins.com/content/dam/ddins/en/pdf/legal/privacy/glb-financial-privacy.pdf (last visited Jan. 9, 2024).

been impacted. The large number of companies that have reported being impacted by the breach underscores the widespread effect and deep consequences of this Data Breach.

9.    Indeed, over 2,600 entities and more than 78 million individuals have been impacted by the Data Breach.[3]

10.    The United States Cybersecurity & Infrastructure Security Agency has identified the data exfiltrators as "CL0P Ransomware Gang," also known as TA505, and reports that the attacks were conducted by exploiting a vulnerability catalogued as "CVE-2023-34362" in order to exfiltrate data from the underlying MOVEit databases.[4] CISA reports that this "Gang" has been known to profit by both publishing and ransoming exfiltrated data.

11.    Despite becoming aware of the Data Breach on June 1, 2023, Delta Dental waited more than six months to notify individuals impacted by the Breach. Indeed, Defendant waited until on or about December 14, 2023 to begin notifying its members that their PII and PHI had been compromised.[5]

12.    Based on the information publicly available to date, a wide variety of PII and PHI was implicated in the Data Breach, including, *inter alia*, individuals' names, addresses, Social Security numbers, driver's license and/or identification numbers, passport numbers, financial account information, tax identification numbers, health insurance policy numbers, and health information.[6]

13.    As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII and PHI are now in the hands of cybercriminals.

14.    Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, and intrusion of their health privacy—risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must

---

[3]  Bert Kondruss, *MOVEit Hack Victim List*, KonBriefing Research, https://konbriefing.com/en-topics/cyber-attacks-moveit-victim-list.html (updated Dec. 11, 2023) (last visited Jan. 9, 2024).

[4]  *#StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit V*ulnerability, Cybersecurity & Infrastructure Security Agency (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.

[5]  *See* Delta Dental of California and its Affiliates Data Breach Notification, *Data Breach Notifications*, Off. Me. Att'y Gen. (Dec. 14, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/4d61e15b-a303-4653-8206-9d54aa0d1e26.shtml.

[6]  *Notice to Maine Attorney General of Security Incident*, Delta Dental of California (Dec. 14, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/4d61e15b-a303-4653-8206-9d54aa0d1e26/f355a1a5-af4b-44c8-a8a8-a165e6237488/document.html.

devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

15.    Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence and declaratory judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII and PHI in Defendant's custody in order to prevent incidents like the Data Breach from reoccurring in the future.

## PARTIES

16.    Plaintiff John Meeks is an adult who, at all relevant times, is a resident and citizen of the State of Iowa. Plaintiff was a member of one of Defendant's healthcare plans. Plaintiff received Notice of the Data Breach from Defendant, in which Plaintiff was informed that his PII and PHI in Defendant's possession had been compromised during the Breach.

17.    Defendant Delta Dental of California is a California corporation with its principal place of business at 560 Mission Street, #1300, San Francisco, California, 94105. Delta Dental is a citizen of California.

18.    Defendant is an enterprise which includes its affiliates Delta Dental Insurance Company; Delta Dental of Pennsylvania; Delta Dental of New York, Inc.; Delta Dental of the District of Columbia; Delta Dental of Delaware, Inc.; and Delta Dental of West Virginia.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

20.    This Court has general personal jurisdiction over Defendant because Delta Dental's principal place of business is located in this District, and, at all relevant times, Defendant has engaged in substantial business activities in California.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Delta Dental resides in this District, and a substantial part of the acts, omissions, and events giving rise to the claims occurred in this District.

## **FACTUAL BACKGROUND**

**A.     Delta Dental and the Services it Provides.**

22.     Delta Dental is a dental insurance company that proudly claims to offer "comprehensive, high-quality oral health care benefits" to more than 45 million individuals around the United States.[7]

23.     Upon information and belief, while administering its health plan services to its members, Delta Dental receives, maintains, and handles individuals' PII and PHI. This information includes, *inter alia*, individuals' names, addresses, Social Security numbers, driver's license and/or identification numbers, passport information, financial account information, and health insurance policy numbers, and health information.

24.     In order to receive Defendant's health plan services, Plaintiff and Class Members were required to entrust Delta Dental with their sensitive and confidential PII and PHI and therefore reasonably expected that Defendant would safeguard their highly sensitive PII and keep their PHI confidential.

25.     Due to the sensitivity of the PII and PHI that Delta Dental collects, stores, and handles, it is aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

26.     By obtaining, collecting, and storing Plaintiff's and Class Members' PII and PHI, Delta Dental assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

27.     Despite the existence of these duties, Delta Dental failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI, and ultimately allowed nefarious third-party hackers to access and exfiltrated Plaintiff's and Class Members' PII and PHI.

---

[7] *Corporate Profile*, Delta Dental of California, https://www1.deltadentalins.com/about/corporate-profile.html (last visited Jan. 9, 2024).

**B.    Delta Dental is Subject to HIPAA.**

28.    Delta Dental is required by the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1302d, *et seq* to safeguard its members' PHI.

29.    As a health insurance company that receives, maintains, and handles its members' PHI, Delta Dental is an entity covered by HIPAA, which sets minimum federal standards for privacy and security of PHI.

30.    As a covered entity, Delta Dental is required to ensure the implementation of adequate safeguards to prevent unauthorized use or disclosure of patients' information, including by implementing requirements of the HIPAA Security Rule, and is required to report any unauthorized use or disclosure of PII and/or PHI, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

31.    As a condition of receiving health plan services, Delta Dental requires that its members, including Plaintiff and Class Members, entrust it with highly sensitive personal information. Due to the nature of Delta Dental's business, which includes providing dental insurance services, Defendant would be unable to engage in its regular business activities without collecting, storing, and aggregating PHI that it knows and understands to be sensitive and confidential.

32.    Indeed, Delta Dental's HIPAA Notice of Privacy Practices expressly acknowledges that it is "required by law to maintain the privacy and security of your Protected Health Information (PHI)."[8]

33.    Plaintiff and Class Members were all members of Delta Dental who entrusted their PHI to Defendant in order to receive health plan or dental insurance services. Plaintiff and Class Members reasonably expected that Delta Dental would safeguard their highly sensitive information and keep their PHI confidential.

**C.    Delta Dental Knew the Risks of Storing Valuable PII and PHI.**

34.    Delta Dental was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

---

[8] *HIPAA Notice of Privacy Practices*, Delta Dental of California, https://www1.deltadentalins.com/about/legal/privacy/hipaa-privacy.html (last visited Jan. 9, 2024).

35.    Delta Dental also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

36.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

37.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false claims for reimbursement.

38.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[10]

39.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[11]

40.    The healthcare industry has become a prime target for threat actors: "[h]igh demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[12]

41.    Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly—making the industry a growing target."[13]

---

[9] Brian Krebs, *The Value of a Hacked Company*, Krebs On Sec. (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[10] *Data Breach Report: 2021 Year End*, Risk Based Sec. (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[11] *Facts + Statistics: Identity theft and cybercrime*, Ins. Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Jan. 9, 2024).

[12] *The healthcare industry is at risk*, SwivelSecure, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Jan. 9, 2024).

[13] *Id.*

42.    Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure if the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[14]

43.    Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[15]

44.    In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[16]

45.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[17]

46.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves the patients of Delta Dental's healthcare provider partners especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

47.    **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach— unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships

---

[14] *Healthcare Data Breach Statistics*, HIPAA J., https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Jan. 9, 2024).

[15] *Id.*

[16] *2022 Breach Barometer*, Protenus, https://www.protenus.com/breach-barometer-report, (last visited Jan. 9, 2024).

[17] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

with government agencies and any number of private companies in order to update the person's accounts with those entities.

48.    The Social Security Administration even warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[18]

49.    Social security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit – among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

50.    **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals – they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. 'Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to – we've even

---

[18] *Identify Theft and Your Social Security Numbers*, Social Sec. Admin. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf, (last visited Jan. 9, 2024).

seen $60 or $70.'"[19] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[20]

51.    Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[21]

52.    "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[22]

53.    According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been

---

[19] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[20] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers (Sept. 30, 2014), https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[21] Steve Adler, *Editorial: Why Do Criminals Target Medical Records*, HIPAA Journal. (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.

[22] *Id.*

charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[23]

54.    **Health Insurance Information**—"stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[24]

55.    **Driver's License Numbers**—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

56.    For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

57.    Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

58.    **Financial Account Information**—Stolen financial account information can have an equally devasting impact on individuals. Cybercriminals can deplete and wipe out a person's life savings or take out a loan or mortgage against someone's home with the click of a button. Indeed, stolen financial account information can be used to transfer money from a victim's bank account to another; to make purchases on online shopping sites; file fake tax returns; and create and use fraudulent checks.[25]

59.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being

---

[23] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[24] Kate O'Flaherty, *Why cyber-Criminals Are Attacking Healthcare -- And How to Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69.

[25] Anthony Aguilar, *What Can Scammers Do With Your Bank Account Number*, Aura (Oct. 5, 2022), https://www.aura.com/learn/what-can-someone-do-with-your-bank-account-number.

used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[26]

60.    Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

61.    Based on the value its members' PII and PHI to cybercriminals, Delta Dental knew or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. Delta Dental failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**D.    Delta Dental Breached its Duty to Protect Individuals' PII and PHI.**

62.    Upon information and belief, Delta Dental engaged Progress Software Corporation to provide it with secure file transfer services—MOVEit. Upon information and belief, Delta Dental uses MOVEit, a secure file transfer software, to exchange files with its Customer-Healthcare Providers. Upon information and belief, by using the MOVEit platform, Defendant had control over the server that was compromised at the time of the Data Breach.

63.    Beginning on or around May 27, 2023, the notorious CL0P ransomware gang exploited a vulnerability in the MOVEit software and accessed, copied, and stole Plaintiff's and Class Members' PII and PHI.[27] The vulnerability allowed CL0P to escalate user privileges and gain unauthorized access to

---

[26] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (2007), https://www.gao.gov/new.items/d07737.pdf (last visited Jan. 9, 2024).

[27] *#StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, *supra* note 4

customer environments.[28] Following the discovery of the initial vulnerability in the file transfer software, five additional vulnerabilities were subsequently discovered.[29]

64.     However, investigations following CL0P's exploitation of the MOVEit vulnerability have subsequently revealed that CL0P had known about this particular vulnerability and had been experimenting with ways to exploit as far back as 2021.[30]

65.     Indeed, one security firm's review of "logs of impacted [MOVEit] clients found evidence of similar [malicious] activity occurring in multiple client environments last year (April 2022) and in some cases as early as July 2021."[31]

66.     The security firm "also discovered the threat actors were testing ways to collect and extract sensitive data from compromised MOVEit Transfer servers as far back as April 2022, likely with the help of automated tools."[32]

67.     As such, the 2022 activity and "[t]he malicious activity appeared to be aimed at exfiltrating Organization IDs ("Org IDs") which identified specific MOVEit Transfer users and would have helped Clop determine which organizations it could access."[33]

68.     On December 14, 2023, Delta Dental filed a notice of data breach ("Notice") with the Attorney General of Maine indicating that the breach had occurred more than six months previously, on or around May 27, 2023.[34]

69.     In the Notice, Delta Dental describes the circumstances surrounding the Breach as follows:

On June 1, 2023, the Company learned unauthorized actors exploited a vulnerability affecting the MOVEit Transfer ("MOVEit") software application. Immediately after being

---

[28] Matt Kapko, *MOVEit Mass Exploit Timeline: How the File-Transfer Services Attacks Entangled Victims*, CYBERSECURITY DIVE (Sept. 25, 2023), https://www.cybersecuritydive.com/news/moveit-breach-timeline/687417/.

[29] *Id.*

[30] Laurie Iacono et al., *Clop Ransomware Likely Sitting on MOVEit Transfer Vulnerability (CVE-2023-34362) Since 2021*, KROLL (June 8, 2023), https://www.kroll.com/en/insights/publications/cyber/clop-ransomware-moveit-transfer-vulnerability-cve-2023-34362.

[31] Sergiu Gatlan, *Clop Ransomware Likely Testing MOVEit Zero-Day Since 2021*, BLEEPING COMPUTER (June 8, 2023), https://www.bleepingcomputer.com/news/security/clop-ransomware-likely-testing-moveit-zero-day-since-2021/.

[32] *Id.*

[33] Simon Hendery, *Ransomware Gang Clop Prepped Zero-Day MOVEit Attacks in 2021*, SC MAGAZINE (June 9, 2023), https://www.scmagazine.com/news/ransomware-gang-clop-zero-day-moveit-2021.

[34] *Notice*, *supra* note 5.

alerted of the incident, the Company launched a thorough investigation and took steps to contain and remediate the incident. On July 6, 2023, the investigation confirmed that Company information on the MOVEit platform had been accessed and acquired without authorization between May 27, 2023 and May 30, 2023. At that time, the Company promptly engaged independent third-party experts in computer forensics, analytics, and data mining to determine what information was impacted and with whom it was associated. This extensive investigation and analysis of the data was recently concluded. Upon that determination, the Company worked diligently to identify any impacted individuals to provide notification. On November 27, 2023, the Company determined what personal information was affected and to whom it belonged.[35]

70.     Based on Delta Dental's Notice, it is evident that CL0P accessed Defendant's MOVEit server in an intentional attack designed to acquire individuals valuable PII and PHI stored therein, and that the bad actors were successful in the attack.

71.     Despite learning of the MOVEit vulnerability on or about June 1, 2023, Delta Dental did not begin notifying impacted individuals for approximately six months. Indeed, not until on or about December 14, 2023, did Plaintiff and Class Members finally begin receiving Notice from Delta Dental, indicating that their PII and PHI was compromised in the Data Breach.

72.     Upon information and belief, Class Members received similar Data Breach notices on or around the same time, informing them that their PII and/or PHI was compromised during the Data Breach.

73.     According to Delta Dental, the PII and PHI of approximately 6.9 million individuals, including their names, addresses, Social Security numbers, driver's license and/or identification numbers, financial account information, and passport numbers, health insurance policy numbers, and health information, was compromised as a result of the Data Breach.[36]

74.     The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic data security procedures in order to protect individuals' PII and PHI. Delta Dental could have prevented the Data Breach, or substantially mitigated its severity, if it had properly screened its vendors or contractors, such as Progress Software, for cybersecurity standards as well as conducting cybersecurity audits of its contractors and vendors.

**E.     Delta Dental is Obligated Under HIPAA to Safeguard Patient PHI.**

75.     Delta Dental is required by HIPAA to safeguard patient PHI.

---

[35] *Notice*, *supra* note 5.

[36] *Id.*; Steve Adler, *Delta Dental of California Data Breach: 7 Million Individuals Affected*, HIPAA J. (Dec. 17, 2023), https://www.hipaajournal.com/delta-dental-california-data-breach/.

76. Delta Dental is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

77. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

78. Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media;" "[m]aintained in electronic media;" or "[t]ransmitted or maintained in any other form or medium."

79. Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual;" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

80. HIPAA requires Delta Dental to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. §§ 164.102, *et seq*.

81. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Delta Dental to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[37]

82. The Department of Health and Human Services further recommends the following data security measures a covered entity such as Delta Dental should implement to protect against some of the more common, and often successful, cyber-attack techniques. According to those guidelines, covered entities should:

---

[37] *Breach Notification Rule*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

a.    Implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

b.    Implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

c.    Mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

d.    Implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

e.    Implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[38]

83.    Upon information and belief, Delta Dental failed to implement one or more of the recommended data security measures and timely notify Plaintiff and Class Members of a data breach impacting their PHI.

84.    While HIPAA permits healthcare providers and their business associates to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers and their business associates to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

85.    As such, Delta Dental is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it acquires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

---

[38] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dep't Health Hum.Servs., (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

86.    Given the application of HIPAA to Delta Dental, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive health plan or dental insurance from Defendant, Plaintiff and Class Members reasonably expected that Delta Dental would safeguard their highly sensitive information and keep their PHI confidential.

**F.    Delta Dental Failed to Comply with FTC Guidelines and Industry Best Practices.**

87.    Delta Dental is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

88.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[39]

89.    In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[40] The guidelines state that:

a.    Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b.    Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c.    Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d.    Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e.    Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

---

[39] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[40] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission, October 2016, available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Jan. 9, 2024).

90.    In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[41]

91.    Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

92.    Delta Dental was at all times fully aware of its obligations to protect the PII and PHI of its members because of its position as a dental insurance company, which gave it direct access to reams of PII and PHI from its members. Delta Dental was also aware of the significant repercussions that would result from its failure to do so.

93.    Upon information and belief, Delta Dental failed to properly implement on or more of the basic data security practices recommended by the FTC. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to members' PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

94.    Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[42]

95.    NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies,

---

[41] *See Start with Security: A Guide for Business*, Federal Trade Commission, June 2015, available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited Jan. 9, 2024).

[42] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

access controls, training, data security controls, network monitoring, breach detection, and incident response.[43] Upon information and belief, Delta Dental failed to adhere to the NIST guidance.

96.    Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare industry, including implementing the following measures:

a.    Email protection systems and controls;

b.    Endpoint protection systems;

c.    Identify all users and audit their access to data, application, systems, and endpoints;

d.    Data protection and loss prevention measures;

e.    IT asset management;

f.    Network management;

g.    Vulnerability management;

h.    Security operations center & incident response; and

i.    Cybersecurity oversight and governance policies, procedures, and processes.[44]

97.    Upon information and belief, Delta Dental's failure to protect massive amounts of PII and PHI is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

98.    Delta Dental was well aware of its obligations to use reasonable measures to protect its members' PII and PHI. Defendant also knew it was a target for hackers, as discussed above. Despite understanding the risks and consequences of inadequate data security, Delta Dental nevertheless failed to comply with its data security obligations.

**G.    Plaintiff's Experience.**

99.    Plaintiff is a member of one of Delta Dental's health plans. In order to receive dental insurance services from Delta Dental, Plaintiff was required to provide and entrust his PII and PHI to Defendant. In requesting and maintaining Plaintiff's PII and PHI, Delta Dental undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Delta Dental, however, did not take reasonable care of Plaintiff's PII and PHI, leading to its unauthorized access and exfiltration as a result of Defendant's inadequate data security measures.

---

[43] *Id.* at Table 2 pg. 26-43.

[44] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited Dec. 11, 2023).

CLASS ACTION COMPLAINT

100. Plaintiff received a Notice dated December 15, 2023 from Delta Dental informing him that his PII and PHI provided to Defendant was compromised in the Data Breach. The Noice put the onus on Plaintiff to protect his PII and PHI by encouraging Plaintiff to remain vigilant and recommending that he regularly review his financial accounts and credit reports and report any suspicious or unrecognized activity immediate.

101. Since learning of the Data Breach, Plaintiff has been required to spend his valuable time and efforts to mitigate his risk of identity theft and fraud, including spending time changing his passwords to his financial accounts.

102. Since the Data Breach, Plaintiff has personally experienced actual fraud. Following the Data Breach, cyber criminals used his payment card, that he used to pay Defendant's dental insurance premiums, to make three fraudulent charges. Plaintiff has also received multiple dark web monitoring alerts from his credit monitoring services, alerting him that his PII and PHI is on the dark web.

103. Plaintiff has suffered actual injury from having his PII and PHI exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including needing to monitor his financial accounts to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

104. In addition, knowing that hackers accessed and likely exfiltrated his PII and PHI and this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

105. As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a heightened risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## H. Plaintiff and Class Members Suffered Damages.

106. For the reasons mentioned above, Delta Dental's conduct, which allowed the Data Breach to occur, caused Plaintiff and members of the Class significant injuries and harm in several ways. Plaintiff

and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

107.    Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

108.    As a result of Delta Dental's failures, Plaintiff and Class Members are at substantial and increased risk of suffering identity theft and fraud or misuse of their PII and PHI.

109.    With respect to healthcare breaches, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[45]

110.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[46]

111.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[47]

112.    Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[48]

---

[45]    Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HealthITSecurity, https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last visited Jan. 9, 2024).

[46]    *Id.*

[47]    Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[48]    *Id.*

113.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[49]

114.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect the PII and PHI of its Customer-Healthcare Providers' patients.

115.    Furthermore, Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to unauthorized third parties.

## CLASS ALLEGATIONS

116.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose PII and/or PHI was compromised in the Delta Dental Data Breach announced on or about December 14, 2023 (the "Class").

117.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

118.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

119.    **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Delta Dental's records, including but not limited to the

---

[49] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, Experian, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Jan. 9, 2024).

files implicated in the Data Breach, but based on public information, the Class includes approximately 6.9 million individuals.

120. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Delta Dental had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Delta Dental was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Delta Dental's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Delta Dental's wrongful conduct.

121. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Delta Dental was the custodian of Plaintiff's and Class Members' PII and PHI, when their PII and PHI was obtained by an unauthorized third party.

122. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

123. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

124.   **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Delta Dental's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

125.   **Injunctive Relief:** Delta Dental has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

126.   **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Delta Dental's books and records.

<u>**FIRST CAUSE OF ACTION**</u>

<u>**NEGLIGENCE**</u>

<u>**(ON BEHALF OF PLAINTIFF AND THE CLASS)**</u>

127.   Plaintiff restates and realleges the allegations set forth above in paragraphs 1 through 126 as if fully set forth herein.

128.   Delta Dental owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

129.   Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

130.   Delta Dental had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Delta Dental was obligated to act with reasonable care to protect against these foreseeable threats. Furthermore, Delta Dental knew or should have known that, if hackers accessed the sensitive data contained in its data systems, the responsibility for

remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendant's unsecured, unreasonable data security measures.

131.    Delta Dental's duty also arose from its position as a dental insurance provider. Delta Dental holds itself out as a trusted provider of dental insurance, thereby assuming a duty to reasonably protect the information it obtains from its members. Indeed, Delta Dental, which receives, maintains, and handles PII and PHI from its members, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

132.    Additionally, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

133.    Similarly, HIPAA is a further source of Defendant's duty to Plaintiff and the Class, as HIPAA required Delta Dental to take reasonable measures to protect Plaintiff's and the Class's sensitive data. Indeed, HIPAA required Delta Dental to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*. By failing to implement reasonable data security measures, Defendant acted in violation of HIPAA.

134.    Delta Dental breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Delta Dental breached its duties through some combination

of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

135.    But for Delta Dental's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

136.    As a direct and proximate result of Delta Dental's negligence, Plaintiff and Class Members have suffered injuries, including:

a.    Theft of their PII and/or PHI;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.      The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.      Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Delta Dental with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.      Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Delta Dental fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.      Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

137.    As a direct and proximate result of Delta Dental's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## NEGLIGENCE *PER SE*

## (ON BEHALF OF PLAINTIFF AND THE CLASS)

138.    Plaintiff restates and realleges the allegations set forth above in paragraphs 1 through 126 as if fully set forth herein.

139.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as Delta Dental, for failing to use reasonable measures to protect individuals' PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

140.    Delta Dental violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendant's conduct was particularly

unreasonable given the nature and amount of PII and PHI it obtained and stored from its members and the foreseeable consequences of a data breach involving member PII and PHI.

141.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

142.    The harm that has occurred as a result of Delta Dental's conduct is the type of harm that the FTC Act was intended to guard against.

143.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

144.    Delta Dental is an entity covered under the HIPAA, which sets minimum federal standards for privacy and security of PHI.

145.    Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Delta Dental had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

146.    Specifically, HIPAA required Delta Dental to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

147.    HIPAA also requires Delta Dental to provide Plaintiff and Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

148.    Delta Dental violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; and by failing to provide Plaintiff and Class Members with notification of the Data Breach within 60 days after its discovery.

149.    Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are members of Defendant's Customer-Healthcare Providers.

150.    The harm that has occurred as a result of Delta Dental's conduct is the type of harm that HIPAA was intended to guard against.

151.    Delta Dental's violation of HIPAA constitutes negligence *per se*.

152.    As a direct and proximate result of Delta Dental's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 136 above.

153.    As a direct and proximate result of Delta Dental's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**DECLARATORY JUDGMENT**

**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

154.    Plaintiff restates and realleges the allegations set forth above in paragraphs 1 through 126 as if fully set forth herein.

155.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statute and state common law as described in this Complaint.

156.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Delta Dental is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

157.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Delta Dental owes a legal duty to secure members' PII and PHI and to timely notify such individuals of a data breach under the common law, Section 5 of the FTC Act, and HIPAA;

    b.    Delta Dental breached and continues to breach this legal duty by failing to employ reasonable measures to secure its members' PII and PHI; and

c.    Delta Dental's breach of its legal duty continues to cause harm to Plaintiff and the Class.

158.    This Court also should issue corresponding prospective injunctive relief requiring Delta Dental to employ adequate security protocols consistent with law and industry standards to protect its members' (*i.e.*, Plaintiff's and the Class's) PII and PHI.

159.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Delta Dental. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

160.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Delta Dental if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial identity theft and other damages. On the other hand, the cost to Delta Dental of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

161.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Delta Dental, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

CLASS ACTION COMPLAINT

B.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.      For damages in an amount to be determined by the trier of fact;

D.      For an order of restitution and all other forms of equitable monetary relief;

E.      Declaratory and injunctive relief as described herein;

F.      Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G.      Awarding pre- and post-judgment interest on any amounts awarded; and

H.      Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: January 11, 2024

                                        **LYNCH CARPENTER, LLP**

                            By:   */s/ (Eddie) Jae K. Kim*
                                        (Eddie) Jae K. Kim (CA Bar No. 236805)
                                        117 East Colorado Blvd., Suite 600
                                        Pasadena, CA 91105
                                        Tel.:   (626) 550-1250
                                        ekim@lcllp.com

                                        **LYNCH CARPENTER, LLP**
                                        Gary F. Lynch (To apply *pro hac vice*)
                                        1133 Penn Avenue, 5th Floor
                                        Pittsburgh, PA 15222
                                        Tel.:   (412) 322-9243
                                        gary@lcllp.com

                                        *Counsel for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT